**PORTLAND AUDUBON SOCIETY, et al., Petitioners,**

v.

**The ENDANGERED SPECIES COMMITTEE, Respondent,**

**Oregon Lands Coalition, Respondent–Intervenor,**

**Northwest Forest Resource Council, et al., Respondents–Intervenors,**

**Association of O & C Counties, et al., Respondents–Intervenors.**

No. 92–70436.

United States Court of Appeals, Ninth Circuit.

Motion Argued and Submitted Sept. 23, 1992.

Decided Feb. 10, 1993.

As Amended April 1, 1993.

Victor M. Sher and Todd D. True, Sierra Club Legal Defense Fund, Inc., Seattle, WA, for petitioners.

Vicki A. O'Meara, Myles E. Flynt, Peter R. Steenland, Jr., and Albert M. Ferlo, Jr., U.S. Dept. of Justice, Washington DC, for respondent.

William Perry Pendley, Todd S. Welch, and Paul M. Seby, Mountain States Legal Foundation, Denver, CO, for intervenors.

Before GOODWIN, D.W. NELSON, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

We consider here a motion filed in a most important and controversial case. The motion itself raises a significant issue of first impression. In the underlying proceeding, petitioners Portland Audubon Society *et al.* (collectively "the environmental groups") challenge the decision of the statutorily-created Endangered Species Committee ("the Committee"), known popularly as "The God Squad", to grant an exemption from the requirements of the Endangered Species Act to the Bureau of Land Management for thirteen timber sales in western Oregon. The environmental groups complain of numerous procedural and substantive flaws in the Committee's decision.

In the motion before us the environmental groups seek: 1) leave to conduct discovery into allegedly improper ex parte communications between the White House and individual Committee members; and, 2) the appointment of a special master to conduct the discovery process. The Committee opposes the motion on the ground that our review must be limited to the record before the agency and that supplementation of that record on appeal would be inappropriate. The Committee argues further that ex parte communications between the White House and its members are permissible under applicable law, and therefore, there is no legal justification for any inquiry into whether the alleged communications occurred.

We agree with the environmental groups that ex parte communications between the White House and the God Squad are contrary to law. We further hold that a record that does not include all matters on which the Committee relied does not consti-

tute the "whole record" required for judicial review and that the failure to include all materials in the record violates the Administrative Procedure Act ("APA"). However, we conclude that the special circumstances that would warrant discovery while a matter is pending before us are not present in this case and accordingly deny the specific relief sought by the environmental groups. Instead, we remand the matter to the Committee for an evidentiary hearing before an administrative law judge ("ALJ") (and for such other procedures as the ALJ may find necessary) on the questions whether any improper communications with the White House occurred during the Committee's decision-making process, and, if so, what remedy is required. The ALJ shall make such findings and recommendations as he or she deems necessary or appropriate in order to aid the Committee and this court in our further handling of the underlying proceeding.

## I. Background

The Endangered Species Act requires that "[e]ach Federal agency shall ... insure that any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2) (1988). However, if the Secretary of the Interior ("Secretary") finds that a proposed agency action would violate § 1536(a)(2), an agency may apply to the Committee for an exemption from the Endangered Species Act. §§ 1536(a)(2), (g)(1)–(2). The Committee was created by the Endangered Species Act for the sole purpose of making final decisions on applications for exemptions from the Act, § 1536(e), and it is composed of high level officials.[1] Because it is the ultimate arbi-

ter of the fate of an endangered species, the Committee is known as "The God Squad".

The Secretary must initially consider any exemption application, publish a notice and summary of the application in the Federal Register, and determine whether certain threshold requirements have been met. 16 U.S.C. §§ 1536(g)(1)–(3). If so, the Secretary shall, in consultation with the other members of the Committee, hold a hearing on the application (which is conducted by an ALJ), and prepare a written report to the Committee. § 1536(g)(4); 50 C.F.R. § 452.05(a)(2) (Oct. 1, 1991). Within thirty days of receiving the Secretary's report, the Committee shall make a final determination whether or not to grant the exemption from the Endangered Species Act based on the report, the record of the Secretary's hearing, and any additional hearings or written submissions for which the Committee itself may call. § 1536(h)(1)(A); 50 C.F.R. § 453.04. An exemption requires the approval of five of the seven members of the Committee. § 1536(h)(1).

On May 15, 1992, the Committee approved an exemption for the Bureau of Land Management for thirteen of forty-four timber sales. It was only the second exemption ever granted by the Committee.[2] The environmental groups filed a timely petition for review in this court on June 10, 1992.[3] The environmental groups have Article III standing if for no other reason than that they allege procedural violations in an agency process in which they participated. *Cf. Lujan v. Defenders of Wildlife*, —— U.S. ——, —— – ——, 112 S.Ct. 2130, 2142–46, 119 L.Ed.2d 351 (1992) (Article III requires that plaintiff filing suit under the Endangered Species Act possess more than a "generally available grievance about government" in order to have standing).[4]

---

1. The seven-member Committee is composed of: the Secretary of Agriculture, the Secretary of the Army, the Chairman of the Council of Economic Advisors, the Administrator of the Environmental Protection Agency, the Secretary of the Interior, the Administrator of the National Oceanic and Atmospheric Administration, and "one individual from each affected State" appointed by the President. 16 U.S.C. § 1536(e)(3). The Committee members from the affected states have one collective vote. 50 C.F.R. § 453.05(d) (Oct. 1, 1991).

2. On February 7, 1979, the Committee granted an exemption from the Endangered Species Act

to the Missouri Basin Power Project. No petition for review was filed.

3. Under 16 U.S.C. § 1536(n), any person, as defined by § 1532(13), may obtain judicial review of any Committee decision regarding an exemption application in any circuit wherein the agency action concerned will be, or is being, carried out.

4. We need not consider the question whether a group which otherwise lacks Article III standing to contest the substantive result of an agency action in federal court gains the ability to do so

Both in their petition and in this motion the environmental groups contend that improper ex parte contacts between the White House and members of the Committee tainted the decision-making process. They base their charges on two press reports, one by Associated Press ("AP") and one by Reuters, and on the facts stated in the declaration of Victor Sher, lead counsel for the environmental groups. Published on May 6, 1992, the AP and Reuters accounts reported that, according to two anonymous administration sources, at least three Committee members had been "summoned" to the White House and pressured to vote for the exemption.[5] In his declaration filed August 25, 1992, Sher stated that his conversations with "several sources within the Administration," who asked for anonymity, revealed that the media reports were accurate, and further that the pressure exerted by the White House may have changed the vote of at least one Committee member. Sher declared that his sources indicated that, in addition to in-person meetings, at least one Committee member had "substantial on-going contacts with White House staff concerning the substance of his decision on the application for exemption by telephone and facsimile, as well as through staff intermediaries." He also declared that he had learned from his sources that White House staff members had made substantial comments and recommendations on draft versions of the "Endangered Species Committee Amendment," a part of the Committee's final decision.[6] For the purposes of the present motion, the Committee neither admits nor denies that these communications occurred.

The environmental groups request three types of discovery: (1) interrogatories and requests for production of documents iden-

---

if it is allowed to participate in the agency hearing. No such question is now before us. The only issue here is whether the petitioner environmental groups have Article III standing to complain about alleged *procedural* violations—violations of the APA's ex parte communications prohibition—that occurred in the course of an administrative process in which they participated as intervenors. If an agency fails to adhere to the ban on ex parte communications in a proceeding to which the prohibition applies, a participant in the agency's decisional processes is actually and particularly injured by the agency's disregard of its statutory duty not to engage in ex parte communications. The agency's conduct causes the participant's injury and the injury is redressable in federal court. Article III requires no more. *See Lujan,* —— U.S. at ——, 112 S.Ct. at 2136.

**5.** The AP report, in pertinent part, reads as follows:

The Bush administration is pressuring "God Squad" members to exempt 44 Northwest timber sales from the Endangered Species Act's protection of the northern spotted owl, sources said Tuesday.

Two administration sources, speaking on condition of anonymity, said that at least three members of the panel have been summoned to White House meetings to discuss coming decisions on the owl.

.　　.　　.　　.　　.

But a spokesman for Interior Secretary Manuel Lujan Jr. said the conversations pertain to general environmental policy and that no political pressure is being placed on the Endangered Species Committee.

According to the sources, each of the meetings was attended by Lujan, the chairman of the committee, and Clayton Yeutter, President Bush's domestic policy adviser.

William K. Reilly, head of the Environmental Protection Agency and a committee member, joined Lujan and Yeutter in meeting Tuesday, one source said.

John Knauss, head of the National Oceanic and Atmospheric Administration and a committee member, attended a similar meeting within the last two weeks, the source said.

Frances Hunt, a forestry specialist for the National Wildlife Federation, said other administration sources had told her that Knauss was pressured at the meeting to vote for the exemption to the Endangered Species Act.

"My understanding is that it was all-out arm-twisting," she said Tuesday. "Lujan is portraying this as something the administration needs."

.　　.　　.　　.　　.

Steve Goldstein, Lujan's chief spokesman, confirmed that Lujan and Reilly met Tuesday with Yeutter.

"Clayton Yeutter is the environmental policy coordinator for the administration. We are part of the administration. But no one from the administration will dictate to any committee member how they should vote," Goldstein said.

Scott Fonner, *Bush Prods 'God Squad' to OK Timber Sales, Sources Say,* The Oregonian, May 6, 1992. The Reuters report contained similar information. *See* Sue Kirchhoff, *Debate Over Owl Protection Comes to a Head on the Hill,* Seattle Post–Intelligencer, May 6, 1992.

**6.** Sher's declaration, in pertinent part, is attached as an Appendix to this opinion.

tifying and relating to the Committee's "decisional staffs" and communications between those individuals and persons in the White House regarding the Committee decision, (2) subpoenas for documents from the White House on the same subject, and (3) depositions of persons identified in response to (1) and (2). They maintain that the requested discovery could be completed in about thirty days. Discovery requests have already been served on both the Committee and the White House.

We heard oral argument on the discovery motion on September 23, 1992. To decide what action to take with respect to the motion, we must first determine whether the ex parte contacts concerning which discovery is sought would be impermissible if they occurred in the manner alleged.[7] If so, we must then decide what relief should be afforded.

## II. *Ex Parte Communications Between the Committee and the President and Members of his Staff are Prohibited by Law.*

This case raises two important and closely related questions of statutory construction: 1) Are Committee proceedings subject to the ex parte communications ban of 5 U.S.C. § 557(d)(1)? and, 2) are communications from the President and his staff covered by that provision? For the reasons that follow, we answer both questions in the affirmative.

## A. The Committee's Proceedings are Subject to the APA's Prohibition on Ex Parte Communications.

■ The environmental groups contend that the Endangered Species Act incorporates by reference the ex parte communications ban of the APA [8] and forbids ex parte contacts with members of the Committee regarding an exemption application. The ex parte prohibition is set forth at 5 U.S.C. § 557(d)(1).[9] Section 557(d)(1) is a broad provision that prohibits any ex parte communications relevant to the merits of an agency proceeding between "any member of the body comprising the agency" or any agency employee who "is or may reasonably be expected to be involved in the decisional process" and any "interested person outside the agency." [10] 5 U.S.C. §§ 557(d)(1)(A)–(B); *see North Carolina, Envtl. Policy Inst. v. Environmental Protection Agency,* 881 F.2d 1250, 1257–58 (4th Cir.1989) (interpreting § 557(d)(1) broadly "to include anyone who was involved in the decisional process but is no longer an agency employee or has recused himself or herself from further involvement"). The purpose of the ex parte communications prohibition is to ensure that "'agency decisions required to be made on a public record are not influenced by private, off-the-record communications from those personally interested in the outcome.'" *Raz Inland Navigation Co. v. Interstate Commerce Comm'n,* 625 F.2d

7. The government contends that the environmental groups' failure to address the ex parte communications issue before the Committee bars them from seeking discovery in this court. We disagree. The environmental groups raised extensive concerns about other allegedly improper ex parte contacts in their brief to the Committee following the ALJ's exemption hearing. The final Committee decision addressed none of the procedural concerns raised by the environmental groups in their post-hearing brief. The environmental groups understandably claim that any further argument regarding ex parte contacts would have been futile. According to the environmental groups (and uncontradicted by the government), reports of the particular ex parte contacts at issue here were published only nine days before the Committee's decision, and the contacts themselves continued up to the day of decision. Moreover, Committee regulations do not appear to provide for a mechanism by which the environmental groups could have made any additional argu-

ments to the Committee regarding the impropriety of the ex parte contacts with its members.

8. Technically, the "APA" refers only to those parts of Title 5 originally enacted by Act of June 11, 1946, ch. 324, 60 Stat. 237, *repealed by* Pub.L. 89–554, 80 Stat. 381 (1966). The current version of § 557(d)(1) was added by the Sunshine Act, Pub.L. 94–409 § 4(a), 90 Stat. 1246 (1976). Because the parties have used the term "APA" to refer to all of the relevant sections of Chapters 5 and 7 of 5 U.S.C., we shall do likewise.

9. An "ex parte communication" is defined as: "an oral or written communication not on the public record with respect to which reasonable prior notice is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter." 5 U.S.C. § 551(14).

10. The government does not dispute that the Committee is an "agency" within the meaning of the APA. *See* 5 U.S.C. § 551(1).

258, 260 (9th Cir.1980) (quoting legislative history).[11]

It is of no consequence that the sections of the Endangered Species Act governing the operations of the Committee fail to mention the APA. The APA itself mandates that its provisions govern certain administrative proceedings. *See, e.g., Marathon Oil Co. v. Environmental Protection Agency,* 564 F.2d 1253, 1261–64 (9th Cir. 1977); *West Chicago v. United States Nuclear Regulatory Comm'n,* 701 F.2d 632, 641 (7th Cir.1983) (collecting cases). By its terms, section 554 of the APA, which pertains to formal adjudications, applies to "every case of adjudication required by statute to be determined on the record after [the] opportunity for an agency hearing." 5 U.S.C. § 554(a); *Girard v. Klopfenstein,* 930 F.2d 738, 741 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 173, 116 L.Ed.2d 136 (1991). That section also provides that any hearing conducted and any decision made in connection with such an adjudication shall be "in accordance with sections 556 and 557 of this title." 5 U.S.C. § 554(c)(2).

■ In other words, by virtue of the terms of APA § 554, sections 556 and 557 are applicable whenever that section applies.[12] *E.g., West Chicago,* 701 F.2d at 641; *Gallagher & Ascher Co. v. Simon,* 687 F.2d 1067, 1072 (7th Cir.1982); *Marketing Assistance Program, Inc. v. Bergland,* 562 F.2d 1305, 1309 (D.C.Cir.1977); *see also*

*Marathon Oil v. EPA,* 564 F.2d at 1262 (if proceeding is adjudicatory in nature, it requires the special protections of APA sections 554, 556, and 557). Accordingly, the ex parte communications prohibition applies whenever the three requirements set forth in APA § 554(a) are satisfied: The administrative proceeding must be 1) an adjudication; 2) determined on the record; and 3) after the opportunity for an agency hearing.[13] The question is, therefore, are those three conditions met here? We find our answer primarily in the language of section 1536(h)(1)(A) of the Endangered Species Act.[14]

■ We conclude that the first requirement of APA § 554(a) is satisfied. Certain administrative decisions closely resemble judicial determinations and, in the interests of fairness, require similar procedural protections. *Marathon Oil v. EPA,* 564 F.2d at 1261. Where an agency's task is "to adjudicate disputed facts in particular cases," an administrative determination is quasi-judicial. *See id.* at 1262 (internal quotations omitted). By contrast, rulemaking concerns policy judgments to be applied generally in cases that may arise in the future; it is *sometimes* guided by more informal procedures. *See id.*[15] Under the Endangered Species Act the Committee decides whether to grant or deny specific requests for exemptions based upon specific factual showings. Thus, the Committee's determinations are quasi-judicial. Ac-

---

11. The APA provides that when such an ex parte contact has occurred, it shall be placed on the public record of the proceeding, and if in the interests of justice, the agency may require the party involved "to show cause why his claim or interest in the proceeding should not be dismissed, denied, disregarded, or otherwise adversely affected on account of such violation." 5 U.S.C. §§ 557(d)(1)(C)–(D).

12. Section 557 is applicable for another reason as well. By its terms § 557 applies whenever a hearing is required to be conducted in accordance with § 556. 5 U.S.C. § 557(a). Because § 554 is applicable here, § 556 automatically applies as well, and, by virtue of the language of § 556, § 557 applies in turn.

13. Section 553(c) of the APA makes the ex parte communications prohibition applicable to formal rulemaking proceedings as well. Under § 553(c), where rules are required by statute to be made on the record after opportunity for agency hearing (formal rulemaking), §§ 556 and 557 apply. In its brief the government contends that Committee decisions are formal

rulemaking. While we do not agree, we note that even if the Committee's argument were correct, the ex parte communications prohibition would still apply via § 553(c). See *infra* at 1541–42. Thus, for practical purposes the government all but concedes the applicability of the ex parte communications prohibition to Committee proceedings.

14. For convenience we refer to the relevant provision as section 1536(h)(1)(A) of the Endangered Species Act. The technically correct designation would be subsection 7(h)(1)(A) of that Act, codified at 16 U.S.C. § 1536(h)(1)(A). The section provides, in relevant part, that Committee determinations shall be "on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) of this section and on such other testimony or evidence as it may receive."

15. There are two types of rulemaking proceedings—formal, *see* note 12 *supra,* and informal. The APA does not bar ex parte communications in informal rulemaking proceedings. *Sierra Club v. Costle,* 657 F.2d 298 (D.C.Cir.1981).

cordingly, they constitute "adjudications" within the meaning of § 554(a).[16]

The legislative history of the Endangered Species Act confirms our conclusion in this respect. The Senate committee report accompanying the 1982 amendments to the Endangered Species Act stated that "the Endangered Species Committee is designed to function as an *administrative court of last resort.*" S.Rep. No. 418, 97th Congress, 2d Sess. 17 (1982) (emphasis added). The Report states that the Committee's decision will be based, in part, upon a "formal adjudicatory hearing." *Id.* at 18. The Report also makes clear that the Committee's duty is to be the ultimate arbiter of conflicts that the parties involved have been unable to resolve. *Id.* at 16–17.

The language of the Endangered Species Act explicitly meets the second requirement of section 554(a). Section 1536(h)(1)(A) of the Act mandates that the Committee make its final determination of an exemption application "on the record." *Cf. Marathon Oil v. EPA,* 564 F.2d at 1263–64 (even where statute does not specify that agency determinations must be made "on the record", if hearing is required, then nature of administrative proceeding itself may require application of APA sections 554, 556, and 557 nonetheless). No further discussion is required on this point.

It is equally clear that the third requirement of APA § 554(a) is satisfied here. Section 1536(h)(1)(A) of the Endangered Species Act also requires that the Committee's final decision be *"based on* the report of the Secretary, *the hearing* held under (g)(4) of this section [ (the Secretary's hearing) ] and on such other testimony or evidence as it may receive." 16 U.S.C. § 1536(h)(1)(A) (emphasis added). Wherever the outer bounds of the "after opportunity for an agency hearing" requirement may lie, we hold that where, as here, a statute provides that an adjudication be determined at least in part *based on* an agency hearing, that requirement is fulfilled.[17]

Because Committee decisions are adjudicatory in nature, are required to be on the record, and are made after an opportunity for an agency hearing, we conclude that the APA's ex parte communication prohibition is applicable. This result is similar to the one we reached in a case involving formal rulemaking, *Central Lincoln Peoples' Util. Dist. v. Johnson,* 735 F.2d 1101, 1119 (9th Cir.1984). There we held that because Congress required rate decisions under the Pacific Northwest Electric Power Conservation Act to be made on the record after a hearing, the procedural protections of the APA were triggered, including the ban on ex parte communications. In that case the applicable provision was APA § 553(c), which, in language almost identical to that contained in § 554(c)(2), provides that "[w]hen *rules* are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply." (emphasis added). Similarly, the pertinent language of the Endangered Species Act, section 1536(h)(1)(A), parallels the language of the statute that we considered in *Central Lincoln.*[18] Thus, the statutory language of the Endangered Species Act, like that of the Pacific Northwest Electric Power Conservation Act, is sufficient to trigger the APA's ex parte communication prohibition.[19]

---

**16.** The APA defines an adjudication as "agency process for the formulation of an order." 5 U.S.C. § 551(7). An order includes all dispositions of an agency in a matter other than rulemaking but including licensing. 5 U.S.C. § 551(6).

**17.** The portion of § 554(a) making that section applicable when a statute provides that an adjudication be determined "after opportunity for an *agency* hearing" (emphasis added) does not mean that such hearing must be conducted directly by the decision-maker. APA § 556(b) permits "an agency hearing" to be conducted by 1) the agency; 2) one or more members of the agency; or 3) one or more agency ALJs. Here, the Secretary is a member and the chairman of the Committee. 16 U.S.C. §§ 1536(e)(3)(E) & (e)(5)(B). Moreover, the hearing was conducted by an ALJ. We also note that here while the "agency hearing" was conducted by an ALJ on behalf of the Secretary, the Endangered Species Act expressly provides that the Secretary's hearing be held in consultation with the Committee. 16 U.S.C. § 1536(g)(4).

**18.** There we construed 16 U.S.C. 839(e)(i)(5), which in relevant part, provides: "The Administrator shall make a final decision establishing a rate or rates based on the record which shall include the hearing transcript, together with exhibits, and such other materials and information as may have been submitted to, or developed by, the Administrator."

**19.** Actually, for purposes of § 557(d)(1), it would not matter whether Committee determinations were viewed as formal adjudications or decisions arrived at by means of formal rule-

■ Neither the government nor the Intervenors Oregon Lands Coalition, *et al.*, ("the lands coalition") has directly responded to the argument that because section 1536(h)(1)(A) provides that Committee determinations are adjudications made on the record and based upon a hearing, APA § 554 applies, and *ipso facto*, so does the ex parte prohibition of § 557(d)(1). Instead, they contend that because one part of the regulations (50 C.F.R. § 452.07(d)) expressly states that "[t]he provisions of 5 U.S.C. § 557(d) apply to the [Secretary's] hearing and preparation of the report," while another part (50 C.F.R. § 453), which relates to the Committee's deliberations, fails to contain any explicit reference to those provisions, the Committee's deliberative process is exempt from the APA's ban on ex parte contacts.[20] For several reasons we do not agree.

First, the inclusion of a specific reference to the ex parte communications prohibition of 5 U.S.C. § 557(d) in the regulations governing the Secretary's hearing was necessary to clarify an ambiguity in the Endangered Species Act. The Secretary's hearing is governed by 16 U.S.C. § 1536(g)(4), which, in turn, provides that sections 554, 555, and 556 of the APA (except sections 556(b)(1)–(2)) are applicable to such hearings. There is no explicit mention of section 557 in 16 U.S.C. § 1536(g)(4). Although as noted *supra*, section 557 always applies when sections 554 and 556 do, as a matter of administrative law, the omission of section 557 from 16 U.S.C. § 1536(g)(4) could conceivably lead to considerable confusion. The reference to APA § 557(d) in the part of the regulations implementing subsection (g)(4) serves to eliminate that confusion and remove any doubt as to the applicability of the ex parte communications prohibition to the proceedings before the Secretary.

By contrast, there is no reason to mention section 557(d) in the part of the regulations concerning the Committee's proceedings. The Committee's action are governed by section 1536(h)(1)(A). No problem comparable to that inherent in 16 U.S.C. § 1536(g)(4) exists with respect to section 1536(h)(1)(A). The text of the latter section, unlike that of the former, does not mention *some* of the applicable APA provisions but omit section 557; rather, it does not mention *any* of the applicable APA sections; thus, no ambiguity arises on the face of the part of the statute governing the Committee's proceedings and no curative provision in the corresponding part of the regulations is necessary.

Second, it would make little sense to read the omission of section 557(d) from part of the regulations governing the Committee's proceedings as a license for Committee members to engage in ex parte contacts. The Endangered Species Act as well as the applicable part of its regulations are intended to ensure that all Committee meetings, hearings, and records are open to the public. 16 U.S.C. § 1536(e)(5)(D); 50 C.F.R. §§ 453.04(b)(4), 453.05(e). Notices of all meetings and hearings must be published in the Federal Register. 50 C.F.R. §§ 453.04(b)(3), 453.05(f). If the Committee determines that written submissions are necessary for it to reach a decision, its invitation of such submissions must also be published in the Federal Register. § 453.-04(a). The transcribed proceedings of any Committee hearings are to be available for public inspection. § 453.04(b)(5). The Committee's final determination of an exemption application must be documented in a written decision, which itself must be published in the Federal Register. § 453.-03(b).

■ The public's right to attend all Committee meetings, participate in all Committee hearings, and have access to all Committee records would be effectively nullified if the Committee were permitted to base its decisions on the private conversations and secret talking points and arguments to which the public and the participating parties have no access. *See United States Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 539 (D.C.Cir.1978). If ex parte communications with Commit-

---

making proceedings. Either way the APA's ex parte communication prohibition would apply: via section § 554(c)(2) (formal adjudication) or § 553(c) (formal rulemaking).

**20.** This interpretation of Committee regulations, raised for the first time at oral argument, is not entitled to deference. Courts do not give defer-

ence to such interpretations by agency appellate counsel where the agency has no established position on a question. *Martin v. Occupational Safety and Health Review Comm'n*, — U.S. —, —, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988).

tee members were permissible, it would render futile the efforts contained in the remainder of the regulations to make the Committee's deliberative process open to the public. Therefore, we conclude omission of a reference to the APA's prohibition against ex parte communications in the part of the regulations governing the proceedings of the Committee does not reflect an intent to allow such contacts to occur.[21]

Third, the Committee is, in effect, an administrative court. See S.Rep. No. 418, 97th Congress, 2d Sess. 17 (1982) ("the Endangered Species Committee is designed to function as an administrative court of last resort"). Ex parte contacts are antithetical to the very concept of an administrative court reaching impartial decisions through formal adjudication. We agree with the observations of the District of Columbia Circuit regarding this principle:

> We think it a mockery of justice to even suggest that judges or other decisionmakers may be properly approached on the merits of a case during the pendency of an adjudication. Administrative and judicial adjudications are viable only so long as the integrity of the decision-making process remains inviolate. There would be no way to protect the sanctity of the adjudicatory process if we were to condone direct attempts to influence decisionmakers through ex parte contacts.

*Professional Air Traffic Controllers Org. v. Federal Labor Relations Auth.*, 685 F.2d 547, 570 (D.C.Cir.1982) (*PATCO v. FLRA II*). By definition, ex parte contacts cannot be addressed and rebutted through an adversarial discussion among the par-

ties. *See North Carolina Envtl. Policy Inst.*, 881 F.2d at 1258; *PATCO v. FLRA II*, 685 F.2d at 563; *U.S. Lines v. FMC*, 584 F.2d at 542. Basic fairness requires that ex parte communications play no part in Committee adjudications, which involve high stakes for all the competing interests and concern issues of supreme national importance. *See Professional Air Traffic Controllers Org. v. Federal Labor Relations Auth.*, 672 F.2d 109, 113 (D.C.Cir. 1982) (*PATCO v. FLRA I*). Behind-the-scenes contacts have no place in such a process.

For the foregoing reasons we hold the Committee's proceedings are subject to the ex parte communications ban of 5 U.S.C. § 557(d)(1).[22]

**B. The President and the White House Staff are Subject to the APA's Prohibition on Ex Parte Communications.**

■ The APA prohibits an "interested person outside the agency" from making, or knowingly causing to be made, an ex parte communication relevant to the merits of the proceeding with a member of the body comprising the agency. 5 U.S.C. § 557(d)(1)(A). Likewise, agency members are prohibited from engaging in such ex parte communication. § 557(d)(1)(B). Although the APA's ban on ex parte communications is absolute and includes no special exemption for White House officials, the government advances three arguments in support of its position that section 557(d)(1) does not apply to the President and his staff.[23]

21. Moreover, if the regulations did permit ex parte communications with Committee members, they would be contrary to the provisions of the Endangered Species Act, which, as we have determined above, make APA § 557(d) applicable. Regulations that are inconsistent with the provisions of the act they implement cannot stand. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984); *State of California, Dept. of Educ. v. Bennett*, 833 F.2d 827, 830 (9th Cir.1987).

22. The environmental groups alternatively argue that § 1536(g)(6) subjects the Committee's proceedings to the ban on ex parte communications. That subsection provides that "the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than

subsection (b)(3) of section 556) of Title 5." The environmental groups say that this provision applies to Committee actions as well as to those taken by the Secretary. The lands coalition, however, argues that subsection (g)(6), like subsection (g)(4), applies only to the Secretary's hearing. Our conclusion that the ex parte communications prohibition applies to Committee proceedings by virtue of the language of § 1536(h)(1)(A) makes it unnecessary for us to resolve this question.

23. Neither the affidavit of the environmental groups' counsel nor the newspaper reports state that former President Bush personally met or lobbied Committee members. The government argues, however, that alleged ex parte communications with the Committee should be treated identically whether they are made by the President or by White House staff carrying out his policies.

First, the government argues that because the President is the center of the Executive Branch and does not represent or act on behalf of a particular agency, he does not have an interest in Committee proceedings greater than the interest of the public as a whole. Therefore, the government contends, neither the President nor his staff is an "interested person". Next, the government maintains that the President and his staff do not fall within the terms of section 557(d)(1) because the President's interest as the Chief of the Executive Branch is no different from that of his subordinates on the Committee. Specifically, the government claims that by placing the Chairman of the President's Council of Economic Advisors on the Committee, Congress directly and expressly involved the Executive Office of the President in the decision-making process. In other words, it is the government's position that because the Committee members are Executive Branch officials, communications between them and the White House staff cannot be considered to come from "outside the agency". Finally, the government argues that if the APA's ex parte communications ban encompasses the President and his aides, the provision violates the doctrine of separation of powers. We find all three of the government's arguments to be without merit.

There is little decisional law on the meaning of the term "interested person". Nor is the meaning of the term clear on the face of the statute. A person can be "interested" in at least three different senses. First, an interested person can be someone who has a curiosity or a concern about a matter, although he may be neutral with respect to the outcome. Second, an interested person can have a preference or a bias regarding a matter's outcome but no direct stake in the proceedings. Finally, a person can be "interested" in a matter in the sense of having a legal interest that will be determined or affected by the decision.

Ultimately, the ex parte communication provision must be interpreted in a common sense fashion. *PATCO v. FLRA II*, 685 F.2d at 563. Its purposes are to insure open decision-making and the appearance thereof, to preserve the opportunity for effective response, and to prevent improper influences upon agency decision-makers. *Id.* at 563, 568. To achieve these ends we must give the provision a broad scope rather than a constricted interpretation. The essential purposes of the APA require that all communications that might improperly influence an agency be encompassed within the ex parte contacts prohibition or else the public and the parties will be denied indirectly their guaranteed right to meaningful participation in agency decisional processes.

The legislative history of the ex parte communication provision confirms the breadth of the ban:

> The term "interested person" is intended to be a wide, inclusive term covering any individual or other person with an interest in the agency proceeding that is greater than the general interest the public as a whole may have. The interest need not be monetary, nor need a person to [sic] be a party to, or intervenor in, the agency proceeding to come under this section. The term includes, but is not limited to, parties, competitors, *public officials*, and nonprofit or public interest organizations and associations with a special interest in the matter regulated. The term does not include a member of the public at large who makes a casual or general expression of opinion about a pending proceeding.

H.R.Rep. No. 880, Pt. I, 94th Cong., 2d Sess. 19–20 (1976) U.S.Code Cong. & Admin.News 1976, pp. 2183, 2201 (emphasis added). The legislative history of APA § 557(d) makes clear that the term "interested person" was intended to have a broad scope. *PATCO v. FLRA II*, 685 F.2d at 562–63. In particular, the provision's history makes it clear that the ex parte communication prohibition was meant to include public officials.

In *PATCO v. FLRA II*, the District of Columbia Circuit found that the Secretary of Transportation was an "interested person" within the meaning of APA § 557(d)(1) when he telephoned two members of the Federal Labor Relations Authority regarding an unfair labor practice charge made by the Federal Aviation Association against the air traffic controllers union. *Id.* at 568. While the court did not

set forth the rationale for its holding, it seems evident that it reasoned that the Secretary of Transportation has a special interest in a major transportation dispute which is beyond that of the general public and that he is, therefore, an interested person.

The government does not contest the validity of *PATCO v. FLRA II* as it applies to Cabinet level officials and below. However, it argues that the President's broader policy role places him beyond the reach of the "interested person" language. We strongly disagree. In fact, we believe the proper argument is quite the opposite from the one the government advances. We believe the President's position at the center of the Executive Branch renders him, *ex officio*, an "interested person" for the purposes of APA § 557(d)(1). As the head of government and chief executive officer, the President necessarily has an interest in *every* agency proceeding. No ex parte communication is more likely to influence an agency than one from the President or a member of his staff. No communication from any other person is more likely to deprive the parties and the public of their right to effective participation in a key governmental decision at a most crucial time. The essential purposes of the statutory provision compel the conclusion that the President and his staff are "interested persons" within the meaning of 5 U.S.C. § 557(d)(1).

The government's next argument—that because the President and the members of the Committee are all members of the executive branch the President is, for all intents and purposes, a "member" of the Committee and may attempt to influence its decisions—amounts to a contention that the President is not "outside the agency" for the purposes of APA § 557(d)(1). The Su-

preme Court soundly rejected the basic logic of this argument in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). The Court held that where legally binding regulations delegated a particular discretionary decision to the Board of Immigration Appeals, the Attorney General could not dictate a decision of the Board, even though the Board was appointed by the Attorney General, its members served at his pleasure, and its decision was subject to his ultimate review. Here, the Endangered Species Act explicitly vests discretion to make exemption decisions in the Committee and does not contemplate that the President or the White House will become involved in Committee deliberations. The President and his aides are not a part of the Committee decision-making process. They are "outside the agency" for the purposes of the ex parte communications ban.[24]

The government then argues that *Sierra Club v. Costle* determined that contacts with the White House do not constitute ex parte communications that would contaminate the Committee's decision-making process, and that we should follow that precedent. 657 F.2d 298, 400–10 (D.C.Cir.1981). We disagree. *Costle* is inapplicable because that case did not consider and, indeed, could not have considered, whether the APA's definition of ex parte communications includes White House contacts. The decision in *Costle* that the contacts were not impermissible was based explicitly on the fact that the proceeding involved was *informal* rulemaking to which the APA restrictions on ex parte communications are not applicable. *Id.* at 400–02, 402 n. 507. In fact, while the *Costle* court recognized that political pressure from the President may not be inappropriate in *informal* rulemaking proceedings, it acknowledged that the contrary is true in formal adjudications. *See id.* at 406–07.

---

**24.** In three instances the Endangered Species Act provides that the Committee does not have the final word on an exemption application. The Secretary of State and the Secretary of Defense have the ultimate say over exemption applications where the grant of an exemption would violate an international obligation and where the grant of an exemption is necessary for national security reasons, respectively. 16 U.S.C. § 1536(i)–(j). The President decides exemption applications relating to restoration of a public facility in a disaster area. 16 U.S.C.

§ 1536(p). However, none of the sections provides for involvement of these outside officials in the Committee's deliberative process. Rather, they remain "outside the agency" with the authority to 1) prevent the Committee from considering an application (the Secretary of State); 2) decide the issue for the Committee (the Secretary of Defense); or, 3) consider the exemption application in lieu of the Secretary of the Interior and the Committee (the President).

Because Congress has decided that Committee determinations are formal adjudications, *Costle* supports, rather than contradicts, the conclusion that the President and his staff are subject to the APA's ex parte communication ban.

Accordingly, the President and his staff are covered by section 557's prohibition and are not free to attempt to influence the decision-making processes of the Committee through ex parte communications.[25] The APA's ban on such communications is fully applicable to the President and his White House aides, and ex parte contacts by them relevant to the merits of an agency proceeding would be in violation of that Act.[26]

■ The government next contends that any construction of APA § 557(d)(1) that includes presidential communications within the ban on ex parte contacts would constitute a violation of the separation of powers doctrine. It relies on language in *Myers v. United States* that states that the President has the constitutional authority to "supervise and guide" Executive Branch officials in "their construction of the statutes under which they act." 272 U.S. 52, 135, 47 S.Ct. 21, 31, 71 L.Ed. 160 (1926). The government argues that including the President and his staff within the APA's ex parte communication ban would represent Congressional interference with the President's constitutional duty to provide such supervision and guidance to inferior officials. We reject this argument out of hand.

■ The Supreme Court established the test for evaluating whether an act of Congress improperly interferes with a presidential prerogative in *Nixon v. Administrator of Gen. Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). First, a court must determine whether the act prevents the executive branch from accomplishing its constitutional functions. *Id.* at 443, 97 S.Ct. at 2790. If the potential for such disruption exists, the next question is whether the impact is justified by an overriding need to promote objectives within the constitutional authority of Congress. *Id.* We conclude that Congress in no way invaded any legitimate constitutional power of the President in providing that he may not attempt to influence the outcome of administrative adjudications through ex parte communications and that Congress' important objectives reflected in the enactment of the APA would, in any event, outweigh any *de minimis* impact on presidential power.

While the government's argument to the contrary arises in the context of Committee decisions regarding Endangered Species Act exemption applications, carried to its logical conclusion the government's position would effectively destroy the integrity of all federal agency adjudications. It is a fundamental precept of administrative law that an when an agency performs a quasi-judicial (or a quasi-legislative) function its independence must be protected. There is no presidential prerogative to influence quasi-judicial administrative agency proceedings through behind-the-scenes lobbying. *Myers* itself clearly recognizes that

---

**25.** The government's argument that the Chairman of the Council of Economic Advisors was put on the Committee to involve the Executive Office in Committee deliberations is spurious. The obvious reason for the inclusion of that official on the Committee is that the God Squad must make difficult decisions with profound economic impact. Five of the six other members of the Committee are Executive Branch officials who also serve solely at the pleasure of the President. *See Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926).

**26.** Any private communication between the White House and Committee members, other than a request for a status report, *see* 5 U.S.C. § 551(14), would be an "ex parte communication" within the meaning of the APA. There is

no dispute before us regarding whether the alleged ex parte communications were "relevant to the merits of the proceedings" and, therefore, violative of the APA. 5 U.S.C. § 557(d)(1). In any event, Congress intended that this requirement also be broadly construed. *See PATCO v. FLRA II*, 685 F.2d at 567–68 (suggesting that even an inquiry regarding the possibility of settlement and expression of a desire for a speedy agency decision would be covered). In this case, the environmental groups contend that the very purpose of the alleged improper communications was to persuade Committee members to vote in favor of the Bureau of Land Management's exemption application. If true, such communications clearly would be relevant to the merits of the proceedings and would violate the APA.

"there may be duties of a quasi-judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President can not in a particular case properly influence or control." 272 U.S. at 135, 47 S.Ct. at 31. And in *Humphrey's Executor v. United States* the Court observed that "[t]he authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted." 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935). The government's position in this case is antithetical to and destructive of these elementary legal precepts, and we unequivocally reject it.

At oral argument the government contended that *Franklin v. Massachusetts,* — U.S. ——, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), supports its contention that the President is not subject to the APA's ban on ex parte communications. We disagree. *Franklin* considered the question of whether the President was an "agency" within the meaning of the APA. The Court determined he was not based on the textual silence of the statute and the Court's "respect for the separation of powers." — U.S. at ——, 112 S.Ct. at 2775–76. Had the Court found the President to be an "agency" for the purposes of the APA, his performance of his statutory duties would have become reviewable by the judiciary under the abuse of discretion standard. *Id.* Given that judicial review of presidential action under the abuse of discretion standard would be a significant innovation in inter-branch relations, the Court was unwilling to assume that Congress intended such a result in enacting the APA without

an express statement to that effect. *Id.* — U.S. at ——, 112 S.Ct. at 2775.

By contrast, the question here is whether the President, like all other government officials and everyone else, is a "person" (specifically and "interested person") within the meaning of 5 U.S.C. § 557(d)(1), which simply forbids improper influence in the deliberations of a quasi-judicial body. We hold that he is and that Congress intended that the President and the White House staff be subject to the APA's general prohibition of ex parte contacts. *Accord Franklin,* — U.S. at ——, 112 S.Ct. at 2789 (Scalia, J., concurring) (a court may impose on the President duties that are equally applicable to any other citizen). Our holding works no innovation comparable to that which would have occurred if the President had been found to be an "agency" within the meaning of the APA. *See Armstrong v. Bush,* 924 F.2d 282, 289 (D.C.Cir.1991) (if President were "agency" for the purposes of the APA, executive orders would have to comply with statute's rulemaking provisions). As noted above, the general principle that the President may not interfere with quasi-adjudicatory agency actions is well settled. Therefore, our decision is fully consistent with *Franklin,* as well as with other controlling Supreme Court authority such as *Myers* and *Humphrey's Executor.*[27]

Congress might well have established a different procedure for granting exemptions from the Endangered Species Act. However, the language of the Act shows that it intended to create the Committee as a quasi-judicial adjudicatory body subject to the statutory restrictions that the APA imposes on such institutions. Congress clearly has the authority to do so, and

---

**27.** Our determination that the President is an "interested person" within the meaning of § 557(d)(1) of the APA is also consistent with the Supreme Court's recent decision in *Rowland v. California Men's Colony, Unit II Men's Advisory Council,* — U.S. ——, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). There, the Court held that the definition of "person" as set forth in the Dictionary Act, 1 U.S.C. § 1, should be read broadly unless it conflicts with the purposes of the statute at issue. — U.S. at ——, 113 S.Ct. at 720, 725–26. *C.M.C. Advisory Council* cites *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), in which the

Court held that the term "white person" in a statute included corporations. Because the purpose of the statute was the protection of Indians, and the exclusion of corporations from its reach would frustrate that purpose, the Court read the term "person" broadly. — U.S. at ——, 113 S.Ct. at 725 (quoting 442 U.S. at 666, 99 S.Ct. at 2537). Here, the purpose of the ex parte communication prohibition is to ensure the integrity of the administrative process. If the President were exempted from the provision, the purpose of the statute would be severely undermined.

thereby to ensure the independence of the agency from presidential control. We conclude that the members of the Committee, despite the Cabinet-level status they otherwise enjoy, are, while serving in their Committee capacities, precisely the kinds of "members of executive tribunals" that *Myers* and *Humphrey's Executor* contemplate are to be free from presidential influence.

In view of the above, we hold that communications between the Committee and the President or his staff are subject to the APA's prohibition on ex parte contacts.

III. *The Remedy to Which the Environmental Groups are Entitled*

    A. Effective Judicial Review Requires Supplementation of the Record if Improper Ex Parte Communications Occurred.

The government and the lands coalition contend that we ought to deny the environmental groups' discovery requests because of the familiar maxim that courts should review an agency decision on the basis of the record before the agency. *See, e.g., Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976). They argue that later supplementation of the record is disfavored. *Id.* The government insists that supplementation is not warranted here and that the requirement that the Committee's decision be supported by the record ensures it will be appropriately reasoned and subject to full judicial review. The lands coalition maintains that the discovery the environmental groups seek would impermissibly inquire into the mental processes of Committee members.

■■■ We find each of these arguments to be wholly unpersuasive. Section 706 of the APA provides that judicial review of agency action shall be based on "the whole record." "The whole record" includes everything that was before the agency pertaining to the merits of its decision. *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555–56 (9th Cir.1989). An incomplete record must be viewed as a "fictional account of the actual decisionmaking process." *Home Box Office, Inc.*

*v. Federal Communications Comm'n*, 567 F.2d 9, 54 (D.C.Cir.1977). When it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate. *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir.1982). The government relies on cases denying supplementation of the record with information on the merits that was *never* presented to the agency. *See, e.g., Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 96 S.Ct. 579, 46 L.Ed.2d 533 (1976); *Walter O. Boswell Memorial Hospital v. Heckler*, 749 F.2d 788 (D.C.Cir.1984). Here, however, the material the environmental groups seek to have included in the record is material that allegedly *was* before the agency. Therefore, supplementation is proper. *See, e.g., PATCO v. FLRA I*, 672 F.2d at 112–13 (record must be supplemented with undisclosed ex parte communications); *Bethlehem Steel Corp. v. Environmental Protection Agency*, 638 F.2d 994, 999–1000 (7th Cir.1980) (supplementation should be allowed where documents related to improper ex parte communications); *see also Grolier, Inc. v. Federal Trade Comm'n*, 615 F.2d 1215 (9th Cir.1980) (where ALJ had worked as staff attorney for FTC Commissioner during relevant time period, discovery regarding alleged improper contacts allowed).

■■■ If the record is not complete, then the requirement that the agency decision be supported by "the record" becomes almost meaningless. *See HBO v. FCC*, 567 F.2d at 54. Indeed, where the so-called "record" looks complete on its face and appears to support the decision of the agency but there is a subsequent showing of impropriety in the process, that impropriety creates an appearance of irregularity which the agency must then show to be harmless. *See Buschmann v. Schweiker*, 676 F.2d 352, 358 (9th Cir.1982); *Marathon Oil Co. v. Environmental Protection Agency*, 564 F.2d 1253, 1271–72 (9th Cir.1977).

The government argues that our decision regarding supplementation in this case should be controlled by language in *Costle* that disclosure of ex parte contacts to a reviewing court was not necessary because any rule issued must have "the requisite *factual support* in the rulemaking record." 657 F.2d at 407 (emphasis in original). As we noted above, *Costle* is a case involving

informal rulemaking. The *Costle* court made clear that its comments applied only to that type of rulemaking. *Id.* at 407–08. However, the court stated that the docketing of conversations in the record between the President and other Executive Branch officers may be necessary to ensure due process where, for example, "such conversations directly concern the outcome of adjudications or quasi-adjudicatory proceedings; there is no inherent executive power to control the rights of individuals in such settings." *Id.* at 407 & n. 527 (citing *Myers*). Therefore, *Costle* militates in favor of rather than against supplementation of the record here.

The government's reliance on *San Luis Obispo Mothers for Peace v. United States Nuclear Regulatory Comm'n*, 751 F.2d 1287 (D.C.Cir.1984), *vacated in part*, 760 F.2d 1320, 1321 (D.C.Cir.1985) (en banc), is also unavailing. There, the petitioners moved to supplement the record with predecisional transcripts and related documents from a meeting of the Nuclear Regulatory Commission. Unlike the documents requested in *Mothers for Peace*, those sought here concern neither the internal deliberative processes of the agency nor the mental processes of individual agency members. Rather, the discovery requested here involves allegedly improper ex parte contacts between decisionmakers and outside parties. If such ex parte communications occurred, then the record must be supplemented to include those contacts so that proper judicial review may be conducted.

B. A Remand to the Committee for an Evidentiary Hearing Rather than Discovery is Appropriate under the Circumstances.

The government contends that if we determine there is a need to supplement the record, we should remand to the Committee rather than permit discovery. The environmental groups admit that a limited and expedited remand could achieve the same results as appellate court discovery proceedings, although it maintains that the instant situation is sufficiently compelling to warrant that type of discovery under the authority of *Public Power Council*, 674 F.2d at 794–95.[28]

We believe that the better course here is to order a remand for a "vigorous and thorough" adversarial, evidentiary hearing of the sort described in *PATCO v. FLRA I*, 672 F.2d at 113; *see also North Carolina Envtl. Policy Inst.*, 881 F.2d at 1258. We granted discovery in *Public Power Council* because of the unusual combination of: (1) the novelty of the issues presented; (2) the need for extremely prompt action under the pertinent statute; and (3) the significance of the questions presented in the petition for review. While the third factor at least is met here, the second is not. Challenges to actions under the Pacific Northwest Electric Power Planning and Conservation Act involve streamlined judicial review to facilitate the exceptionally swift action the statute requires. *Public Power Council*, 674 F.2d at 794. *See also* 9th Cir.R. 15–2: "Procedures for Review Under Pacific Northwest Electric Power and Planning Act". In the present case, at the time of oral argument there was an injunction in place preventing execution of the timber sales in dispute. None of the parties has advised us of any change in the status of that injunction. Thus, there is no particular need for "extremely prompt action" on our part. *See Public Power Council*, 674 F.2d at 794. The purposes of the Endangered Species Act will not be frustrated or imperiled if we permit an administrative resolution of the factual questions that are essential to determining whether the whole agency record has been compiled, and whether the APA has been violated.

Accordingly, in line with *PATCO v. FLRA I*, we issue the order filed concurrently herewith directing the Committee to hold, with the aid of a specially appointed administrative law judge, an evidentiary hearing to determine the nature, content, extent, source, and effect of any ex parte communications that may have transpired between any member of the Committee or

---

28. The government and the lands coalition argue that the environmental groups have made an insufficient showing to warrant discovery against the President or his staff (citing *United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107–08, 41 L.Ed.2d 1039 (1974)). Those same arguments could be advanced to the same or a lesser extent with respect to a remand to the agency for a hearing before an ALJ. We reject such contention. In the absence of declarations denying that alleged violations of the APA's ex parte communications prohibition occurred, the declaration of the environmental groups' counsel (attached as an appendix) and the newspaper reports (*supra* n. 3) are sufficient to warrant a remand.

its staff and the President or any member of his staff regarding the determination of the exemption application at issue. All interested parties will be allowed to participate in the hearing, personally, or by counsel. Nothing in this opinion should be construed as foreclosing the ALJ from enlisting the full panoply of available means to determine the merits of the allegations the environmental groups assert.

Following the hearing, the ALJ will request that all interested parties submit proposed findings. When these findings are received, the ALJ will submit the record of the hearing and all proposed findings, as well as the ALJ's own findings and recommendations, to the parties and to the Clerk of the Court. The parties will then advise the court what further proceedings, if any, should, in their opinion, be held, either before the Committee or this court. This panel will retain jurisdiction over this matter pending further order of the court.

## IV. *Conclusion*

In sum, we hold that the Committee's proceedings regarding an application for exemption from the Endangered Species Act are governed by those provisions of the APA applicable to formal adjudications and, in particular, by the prohibition on ex parte communications. We also hold that the President and his staff are subject to the APA's ex parte contacts ban. Thus, the allegations of the environmental groups, if true, establish a violation of the APA. Finally, we hold that discovery on appeal is not warranted, but that the environmental groups' allegations require a remand and an evidentiary hearing before an ALJ. Therefore, the environmental groups' motion for discovery is DENIED but the matter is REMANDED to the Committee for further proceedings.

## APPENDIX

### EXCERPTS FROM THE DECLARATION OF VICTOR M. SHER

Since the ESC's final decision on May 14,[sic] 1992, I have spoken with several sources within the Administration, including federal staff and employees close to some of the decisionmakers on the ESC. These individuals hold positions in which I would expect them either to have direct access to ESC decisionmakers themselves, or to other individuals with such access, and I would therefore expect them to be familiar with the events surrounding the ESC's May 14, 1992 decision to exempt 13 timber sales from the provision of . . : 16 U.S.C. § 1536(a)(2). In fact, these sources have indicated to me that they are familiar with these events in considerable detail.

. . . . .

In particular, my conversations with these individuals have revealed both that the media reports of pre-decisional pressure from the White House on ESC members were accurate (despite denials from a spokesman for the Department of the Interior). Moreover, they reveal that at least in one instance, such pressure may have succeeded in influencing (and, ultimately, changing) the vote of at least one decisionmaker. Such a changed vote would have led directly to the ESC's granting of the exemption, instead of denying it. (Given that an exemption application must receive five votes to prevail, and that the ESC voted 5–2 in favor of the exemption in this case, even a single vote change would have meant a denial of the exemption.)

Based on these conversations, I have good cause to believe that the discovery sought in PAS' pending motion would reveal at least the following facts regarding contacts between the White House and the ESC:

a. The press reports of White House pressure on ESC decisionmakers to vote in favor of an exemption—particularly, on Administrator John Knauss . . . and Administrator William Reilly . .∴—during the period preceding the ESC's vote on May 14 are accurate. Administrator Knauss met with Clayton Yeutter and other members of the White House staff on April 28, 1992, and several times thereafter. Administrator Knauss and his staff also had substantial on-going contacts with White House staff concerning the substance of his decision on the application for exemption by telephone and facsimile, as well as through staff intermediaries.

b. Administrator Reilly also met with Clayton Yeutter and other White House staff, on May 5, 1992, and again on May 13, 1992.

c. ESC members were told by White House staff that the Bush Administration viewed an ESC decision to grant an exemption as extremely important politically.

White House staff sought to persuade ESC members, including both Administrator Knauss and Administrator Reilly, to support an exemption.

d. Administrator Knauss ultimately voted to support granting the exemption for 13 timber sales. Administrator Reilly ultimately voted against the exemption.

e. The terms of the "Endangered Species Committee Amendment" attached to the ESC's May 14, 1992, final decision were presented to most of the ESC for the first time at the ESC's meeting on May 14. These terms were discussed directly and repeatedly in direct contacts between Administrator Knauss and his staff at NOAA (on the one hand), and Clayton Yeutter and his staff at the White House (on the other); other ESC members and staff may have been involved as well. A series of written drafts of the Amendment passed between the White House and NOAA over the course of the morning of May 14, 1992, and White House staff provided substantive comments and recommendations on draft versions of the Amendment.

My sources have asked that I not identify them for the Court, as each is concerned that such disclosure would likely lead to adverse consequences in his or her current employment.

My judgment that good cause exists for further investigation is also influenced by the context in which this case arises, which is not a vacuum. Rather, the controversy in the Pacific Northwest over the government's compliance with federal environmental laws intended to protect public lands and wildlife has resulted in considerable treatment of the issue by the federal courts, including this Court. I have been lead counsel in much of this litigation, and am thoroughly familiar with the legal issues and factual circumstances involved in each case, which have resulted in numerous findings of illegal conduct by federal agencies. [Citations to numerous cases finding violations of law by BLM, Forest Service, and Secretary of Interior].

GOODWIN, Circuit Judge, concurring:

While I agree that we should remand for discovery regarding the nature and extent of the ex parte contacts at issue, I do not join in that part of the opinion which holds that the President is subject to the APA's ban on ex parte communications.

In deciding the questions actually presented in this case, I agree that all of the executive and cabinet level officials involved here are subject to APA's ban on ex parte communications. This holding, however, does not require us to answer the still open question whether the President himself also falls within the rule's purview.

As the opinion acknowledges in a footnote, there is no evidence in the record that the then-incumbent President made any ex parte contacts with members of the "God Squad." *See* Opinion at 1544 n. 23. Accordingly, we have no need to reach the issue whether the President is himself subject to the APA's ban on ex parte communications—a question which presents troubling separation of powers problems. While the amended opinion distinguishes *Franklin v. Massachusetts*, —— U.S. ——, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), in reaching its holding, I would not address this question until it is squarely presented.